UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | 3:00CR227(SRU) |
| | : | |
| | : | |
| EDWARD ESTRADA, | : | |
| a/k/a "Fry"" | : | June 21, 2006 |

**SUPPLEMENTAL MEMORANDUM OF THE UNITED STATES**
**IN AID OF RE-SENTENCING**

The government respectfully submits that after reviewing the PreSentence Report ("PSR") and the Addendums to the PSR, the trial transcripts of the defendant's trial, the trial transcript of <u>United States v. Eddie Mercado (Criminal Number 3:04CR166(SRU)</u>, the transcript of the defendant's original sentencing hearing, and the defendant's and government's sentencing memoranda, the Court imposed a just and reasonable sentence at the original sentencing and considered the factors in 18 U.S.C. § 3553(a) in so doing.  Moreover, re-sentencing the defendant to a lesser term of imprisonment would undermine the goals of sentencing, and would be wholly inappropriate and unreasonable in light of the defendant's continuing criminal conduct.  Thus, the government respectfully urges the Court to impose the lifetime term imprisonment previously imposed.

**I.     ARGUMENT**

With respect to the calculation of the guideline range, the Government believes that the guideline sentence of a lifetime term of imprisonment that the Court imposed at the original

sentencing, which was just and reasonable and took into account the 18 U.S.C. § 3553(a) factors, and should be imposed at the defendant's resentencing.

In *United States v. Booker*, 125 S. Ct. 738 (2005), the Supreme Court held that the United States Sentencing Guidelines, as written, violate the Sixth Amendment principles articulated in *Blakely v. Washington*, 124 S. Ct. 2531 (2004). The Court determined that a mandatory system in which a sentence is increased based on factual findings by a judge violates the right to trial by jury. As a remedy, the Court severed and excised the statutory provision making the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus declaring the Guidelines "effectively advisory." *Booker*, 125 S. Ct. 738, at 757. This ruling results in a system in which the sentencing court, while required to consider the Guidelines, may impose a sentence within the statutory maximum penalty for the offense of conviction. The sentence will be subject to appellate review for "reasonableness." *Id.* at *24.

In *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the Court summarized the impact of *Booker* as follows:

> First, the Guidelines are no longer mandatory. Second, the sentencing judge must consider the Guidelines and all of the other factors listed in section 3553(a). ***Third, consideration of the Guidelines will normally require determination of the applicable Guidelines range,*** or at least identification of the arguably applicable ranges, and consideration of applicable policy statements. ***Fourth, the sentencing judge should decide, after considering the Guidelines and all the other factors set forth in section 3553(a), whether (I) to impose the sentence that would have been imposed under the Guidelines, i.e., a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence.*** Fifth, the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence.

*Crosby*, 397 F.3d 103 at 113 (emphasis added).

In other words, a sentencing now involves two analytical stages: first, a determination of the applicable Guideline range (including any departures); and second, a determination of whether in light of the Guidelines and the other factors listed in § 3553(a), there is any reason to impose a non-Guidelines sentence.

As to the first step, the applicable Guideline range "is normally to be determined in the same manner as before *Booker/Fanfan*." *Id.* at 112. In limited circumstances, "precise calculation of the applicable Guidelines range may not be necessary" when a judge determines that either of two (not necessarily overlapping) ranges applies, and if "the sentencing judge, having complied with section 3553(a), makes a decision to impose a non-Guidelines sentence, regardless of which of the two ranges applies." *Id.* Such may be true in cases involving "complicated matters, for example, determination of monetary loss," or "close questions . . . as to the precise meaning or application of a policy statement authorizing a departure." *Id.* In general, however, the first stage requires the Court to engage in the familiar process of making factual findings by a preponderance of the evidence, and interpreting and applying the Guidelines to those facts in order to ascertain the appropriate sentencing guidelines range.

As to the second step, the judge must consider the guidelines in conjunction with the other factors enumerated in § 3553(a), in order to determine whether there is any reason to deviate from the guideline range indicated in the first stage. These factors include: (1) "the nature and circumstances of the offense and history and characteristics of the defendant"; (2) the need for the sentence to serve various goals of the criminal justice system, including (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment," (b) to accomplish specific and general deterrence, (c) to protect the public from the

defendant, (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (3) the kinds of sentences available; (4) the sentencing range set forth in the Guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to victims.

Because the Guidelines reflect the Sentencing Commission's considered judgment about all of the factors set forth in § 3553(a), the Supreme Court and the Second Circuit have made it clear that the Guidelines continue to play a central role in a sentencing court's § 3553(a) calculus. Writing for the remedial majority in *Booker*, Justice Breyer explained that sentencing courts, "while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." 125 S. Ct. 738 at 767. As the Court of Appeals has pointed out, "the excision of the mandatory aspect of the Guidelines does not mean that the Guidelines have been discarded." *Crosby*, 397 F.3d 103 at 111.

> [It] is important to bear in mind that *Booker/Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge. Thus, it would be a mistake to think that, after *Booker/Fanfan*, district judges may return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum. On the contrary, the Supreme Court expects sentencing judges faithfully to discharge their statutory obligation to "consider" the Guidelines and all of the other factors listed in section 3553(a). We have every confidence that the judges of this Circuit will do so, and that the resulting sentences will continue to substantially reduce unwarranted disparities while now achieving somewhat more individualized justice. In short, there need be no "fear of judging."

*Id.* at 113.

In the vast majority of cases, a sentence within the advisory guideline range will be the most effective way of promoting uniform, fair sentencing throughout the nation in compliance with § 3553(a). This view is shared by Congress and the Supreme Court. As every Supreme Court justice in the various opinions in *Booker* recognized, the Guidelines carry out the express national policy, as articulated by Congress, that sentences be uniform across the country to the extent possible and be based on the offender's actual conduct and history. *See, e.g., Booker*, 125 S. Ct. 738 at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); *id.* ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); *id.* at 783 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); *id.* at 789 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity.").

Most recently, in *United States v. Rattoballi*, Docket No. 05-1562-cr (2d Cir. June 15, 2006), the Second Circuit held that "[o]ur own review for reasonableness, though deferential, will not equate to a "rubber stamp." *Rattoballi* at 13, citing *United States v. Moreland*, 437 F.3d 424, 433 (4th Cir. 2006). In *Rattoballi*, the Court further clarified the importance of the Guidelines as a factor to be considered by a district court in arriving at and imposing a reasonable sentence:

> "In calibrating our review for reasonableness, we will continue to seek guidance from the considered judgement of the Sentencing Commission as expressed in the Sentencing Guidelines and authorized by Congress. See United States v. Cage, — F.3d ----, ----, 2006 WL 1554674, at *7 (10th Cir. 2006) (stating that "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration when we determine reasonableness"). "[T]he guidelines cannot be called just 'another factor' in the statutory list, 18 U.S.C., § 3553(a), because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges." United States v. Jimenez-Beltre, 440 F.3d 514, 518 (1st Cir. 2006) (en banc) . . .
>
> Further, in discharging our duty to review sentences for reasonableness, we are required to consider any pertinent policy statements issued by the Sentencing Commission or the Congress (just as the district courts are required to consider those policy statements when imposing sentence) . . . .
>
> A non-Guidelines sentence that a district court imposes in reliance on factors incompatible with the Commission's policy statements may be deemed substantively unreasonable in the absence of persuasive explanation as to why the sentence actually comports with the § 3553(a) factors."

*Rattoballi*, 14-17, citing 18 U.S.C. § 3553(a)(5); *Moreland*, 437 F.3d at 434 ("A sentence may be substantively unreasonable if the court relies on an improper factor or rejects policies articulated by Congress or the Sentencing commission.").

Thus, fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing outlined in § 3553(a), and should occur absent truly unusual circumstances. *United States v. Wanning*, 354 F.Supp.2d 1056, 1061 (concluding that "judges should, in the exercise of their newly minted discretion, normally follow the Guidelines, and the ranges produced by them, because that approach represents the best (though an imperfect) method of sentencing"). The government commends to the Court's attention the scholarly opinions of Judge Cassell in *United States v. Wilson*, 350 F.Supp.2d 910 (D. Utah Jan. 13, 2005) ("*Wilson I*"), and 355 F.Supp.2d 1269 (D.Utah Feb. 2, 2005) (*Wilson II*), which reach this same conclusion. As Judge Cassell

explained, the Guidelines represent the product of an expert commission which has studied the sentencing process at great length, under the specific mandate of Congress to fashion recommended sentences that carry out the purposes defined by Congress. The resulting Guidelines plainly reflect the public's will, as expressed by their democratically elected representatives, in that Congress has repeatedly approved of the Guidelines or acted to adjust them to accord with legislatively determined policies. *Wilson* further observed that guided sentencing appears to have had a positive impact in deterring criminal conduct throughout the country, and thus serves the purpose of deterrence as well as punishment and fairness. Judge Cassell further observed that the Guidelines provide appropriate guidance, which is fully consonant with legislative policy, as to when particular offender characteristics properly factor into the sentencing calculus -- for example, forbidding consideration of factors such as race, religion, or socioeconomic status, and assigning only modest weight to factors such as family ties, age, and civic contributions. *Wilson II*, 355 F.Supp.2d at 1277. Importantly, Judge Cassell properly concluded that one of the primary goals of the criminal sentencing system is "equal justice under the law -- with a sentencing statute that mandates similar outcomes for similar crimes committed by similar offenders." *Id.* at 1286. "The only realistic way to insure this is to follow generally the Guidelines." *Id.* For all of these reasons, a court should "give heavy weight to the Guidelines in determining an appropriate sentence. In the exercise of its discretion, the court will only depart from those Guidelines in unusual cases for clearly identified and persuasive reasons." *Wilson I*, at 912.

Accordingly, a sentence within the guideline range is reasonable, and accommodates the congressional purpose set forth in § 3553(a), affirmed by the Supreme Court, of obtaining fair sentences which are uniform to the extent possible.

This case does not present the rare case in which the Guidelines (including the rules governing departures) fail to produce a sentencing range that fully accords with the various factors set forth in § 3553(a). Therefore, the government respectfully recommends that the Court again sentence the defendant to a lifetime term of imprisonment.

**Quantity, Role And Other Sentencing Adjustments**

In both his sentencing memorandums, the defendant incorrectly argues that post-*Booker,* sentencing adjustments must be found by a jury beyond a reasonable. See 9/13/05 Def.Mem. at 2-5, 5/8/06 Def.Mem. at 3-4. With respect to any legal basis supporting different quantity and sentencing adjustment determinations, (1) the Second Circuit has routinely denied *Apprendi* challenges to the district courts finding drug amounts and other adjustments on the basis of preponderance of the evidence and (2) post-*Booker* law affords defendant no new ground for a different sentence. Under these circumstance,–where the indictment charged the defendant with conspiring to possess with intent to distribute 1,000 grams or more or heroin – the quantity of drugs required to trigger 21 U.S.C. § 841 (b)(1)(A) -- and the jury found the defendant guilty of conspiring to possess with intent to distribute 1,000 grams or more in a special verdict form, it is established that the Court can find the quantity by a preponderance of the evidence, and sentence the defendant to a term of imprisonment as long as it does not exceed the statutory maximum, which in this case was life. *Booker*; *Gonzalez*; *United States v. Cordoba-Murgas*, 422 F.3d 65 (2d Cir. 2005) (court held that to impose a sentence above the statutory maximum for an

indeterminate quantity of drugs, the type and quantity of drugs is an element of the offense that must be charged in the indictment and submitted to the jury and that defendant's plea allocution which admits to a specific drug quantity effectively waives the requirement of submitting the drug quantity question to the jury).

Similarly, the Court properly imposed a two-level upward adjustment for use of a firearm, a three-level upward adjustment for defendant's role as a manager or supervisor, and a two-level upward adjustment for use of a minor, and made specific findings supporting these adjustments, by a preponderance, based primarily on the extensive evidence adduced at the defendant's trial.

### The Sentence Already Imposed By This Court Is In Accordance With § 3553(a)

None of the factors enumerated in section 3553(a) warrant a deviation from the guideline range imposed at the original sentencing. Moreover, the Court considered the factors in section 3553(a) in his imposition of its original sentence. Not only does the use of the guidelines themselves ensure a uniform approach to sentencing, § 3553(a)(6), but, as noted above, the Guidelines, consisting of offense characteristics and various grounds for departure, address all of the considerations relevant to sentencing, as articulated in 18 U.S.C. § 3553(a).

The sentence imposed in this case also served several purposes of punishment as identified in §3553(a). Specifically, the original sentence reflected the serious "nature and circumstances" of the defendant's involvement as a supplier of large amounts of heroin in the drug conspiracy, his use of firearms in connection with the offense, his role as a manager or supervisor and his use of minors to distribute the drugs he supplied; §3553(a)(1), the need for the sentence to provide "adequate deterrence to criminal conduct," §3553(a)(2)(B), and the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to

provide just punishment for the offense." §3553(a)(2)(A).  In addition, the Court imposed this entirely appropriate sentence only after considering the defendant's personal history and characteristics at the time of the original sentencing as contained in the PSR.  §§ 3553(a)(1), (a)(2)(A) and (a)(2)(B).  Thus, the Court already considered the factors in 3553(a) in arriving at this just and reasonable sentence.

### The Court Should Not Consider Post-Sentencing Rehabilitation at the Re-sentencing

To the extent that the defendant argues for a non-guidelines sentence based on post-sentencing rehabilitation, the government submits the Court should not take post-sentencing rehabilitation into account when re-sentencing defendants in this context.

The Court should not take post-sentencing rehabilitation into account in re-sentencing the defendant for significant policy and fairness reasons.  The Court of Appeals for the Second Circuit "express[ed] no views" in *United States v. Crosby* about what current circumstances should be taken into account when re-sentencing a defendant after *Booker/Fanfan*.  *United States v. Crosby*, 397 F.3d 103, 118 n.19 (2d Cir. 2005).  *See United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L.Ed.2d 621 (2005) ("*Booker/Fanfan*").  But the United States Sentencing Commission has indicated that such consideration would be inconsistent with the purposes of sentencing.  Sentencing judges cannot use post-sentencing rehabilitation in establishing the advisory Guidelines range.  U.S.S.G. § 5K2.19 (2004).  Judges also should not use post-sentencing rehabilitation as a reason to vary from the advisory Guidelines range, for the sensible policy reasons articulated by the Sentencing Commission.

Since November 1, 2000, the Sentencing Guidelines have not allowed judges to take post-sentencing rehabilitation into account. Section 5K2.19 reads:

> Post-sentencing rehabilitative efforts, even if exceptional, undertaken by a defendant after imposition of a term of imprisonment for the instant offense are not an appropriate basis for a downward departure when RE-SENTENCING the defendant for that offense. (Such efforts may provide a basis for early termination of supervised release under 18 U.S.C. § 3583(e)(1).)

U.S.S.G. § 5K2.19 (2004) (amendment effective November 1, 2000).

In its Commentary to this provision, the Sentencing Commission explains that a departure based on post-sentencing rehabilitation is inappropriate "because such a departure would (1) be inconsistent with the policies established by Congress under 18 U.S.C. § 3624(b) [permitting the Bureau of Prisons to award good-time credits] and other statutory provisions for reducing the time to be served by an imprisoned person; and (2) inequitably benefit only those who gain the opportunity to be resentenced *de novo*." U.S.S.G. § 5K2.19, Commentary (2004). In its reasons for the amendment, the Sentencing Commission expanded upon its commentary, and reiterated the danger that such downward departures would "inequitably benefit only those few who gain the opportunity to be resentenced *de novo,* while others, *whose rehabilitative efforts may have been more substantial*, could not benefit simply because they chose not to appeal or appealed unsuccessfully." *See* U.S.S.G. § 5K2.19, amt. 602, Reason for Amendment (2000) (emphasis added). These same dangers are present here.

Under *United States v. Crosby*, a judge may not consider post-sentencing rehabilitation in deciding *whether* to resentence a defendant after *Booker/Fanfan*. *See Crosby*, 397 F.3d at 118 n.19 ("If, *based solely on the circumstances that existed at the time of the original sentence*, the sentencing judge decides to resentence . . . .") (emphasis added). Therefore, the disparity that

11

would result from only resentenced defendants having the benefit of post-sentencing rehabilitation departures would reintroduce unfairness into the system, contrary to the purposes of sentencing. *See* 18 U.S.C. § 3553(a)(6); 28 U.S.C. § 991(b)(1)(B); 28 U.S.C. § 994(f). The Sentencing Commission determined that disparities such as these are unwarranted. And indeed, there is no principled reason why a defendant should benefit from post-sentencing conduct *simply because* there were independent reasons to undertake re-sentencing after *Booker*/*Fanfan*. *See* U.S.S.G. § 5K2.19; *United States v. Evans*, 1 F.3d 654, 654 (7th Cir. 1993) (per curiam) ("[I]t is the Bureau of Prisons, not the court, that determines whether a federal prisoner should receive good time credit."); 18 U.S.C. § 3624(b). The fact that a court decides to resentence a defendant in light of *Booker*/*Fanfan* does not make the post-sentencing conduct of the defendant relevant to the defendant's re-sentencing.

   The addition of Section 5K2.19 to the Guidelines was "prompted by the circuit conflict" about the consideration of post-sentencing rehabilitation. Reasons for Amendment (citation omitted). Prior to this amendment, the Second Circuit had held that sentencing judges *could* consider post-conviction rehabilitation when re-sentencing defendants. *See United States v. Core*, 125 F.3d 74, 75 (2d Cir. 1997), *cert. denied sub nom. Reyes v. United States*, 522 U.S. 1067 (1998); *Werber v. United States*, 149 F.3d 172, 178-79 (2d Cir. 1998) ("Having vacated the original sentence, the district court was required to resentence Werber, and did. In so doing, the district court was required to resentence Werber in light of the circumstances as they stood at the time of his re-sentencing.") (citing *Core,* 125 F.3d at 77). But the Sentencing Commission disagreed, siding with the Eighth Circuit, which had held that district courts may not depart downward based on post-sentencing rehabilitation. *See United States v. Sims*, 174 F.3d 911 (8th

Cir. 1999); U.S.S.G. § 5K2.19, amt. 602, Reason for Amendment (2000). The Sentencing Commission elaborated,

> In *Sims*, the Eighth Circuit concluded that a rule allowing a departure at re-sentencing based on post-sentencing rehabilitation *would result in unwarranted disparity because re-sentencing would be a fortuitous event benefitting only some defendants; would reinstate a parole-like system; and would interfere with the authority of the Bureau of Prisons to award good-time credits. See Sims*, 174 F.3d at 912-13; [*United States v.*] *Rhodes*, 145 F.3d [1375,] 1384 [(D.C. Cir. 1998)] (Silberman, J., dissenting).

U.S.S.G. § 5K2.19, amt. 602, Reason for Amendment (2000) (emphasis added). *See also Rhodes*, 145 F.3d at 1384 (Silberman, J., dissenting) ("Rhodes will have the chance to secure a downward departure that is unavailable to other prisoners with identical, or even superior, prison records. The Sentencing Reform Act seeks to end the sort of unfairness that results from allowing some defendants to gain consideration that others cannot.").

Even though courts in the Second Circuit generally aim to sentence defendants as they stand before the court at the time, *see Werber*, 149 F.3d at 178, *Core*, 125 F.3d at 77, two considerations outweigh this aim in the case of post-sentencing rehabilitation. Post-sentencing rehabilitation is unique among intervening circumstances, *United States v. Bryson*, 229 F.3d 425, 426 (2d Cir. 2000), first, because it is available to every defendant and is in every defendant's exclusive control, and second, because the Bureau of Prisons is charged with giving it appropriate consideration. These two bases, especially, demonstrate that the Sentencing Commission's decision to forbid downward departures based on post-sentencing rehabilitation was sensible and should be followed.

With respect to the first issue, post-sentencing rehabilitation differs from other offender characteristics because it is in each defendant's exclusive and ongoing personal control. Because

13

all offenders are equally likely to be able to present such a claim, and because it arises exclusively in circumstances that make such a claim unavailable to all similarly situated defendants, there is particular unfairness in allowing a fortuity -- namely, the timing of sentencing -- to permit such disparate consideration of the same factor. Such ongoing personal control is not present in the case of extraordinary family circumstances, which were discussed in *Quintieri*, 306 F.3d at 1230, or of many other intervening circumstances which give rise to other typical grounds for downward departure, such as diminished capacity. Other grounds for departure, such as extraordinary family circumstances, or physical infirmity, for example, may exist at any point in time, and are likely to be present at the time of a defendant's original sentencing as at a re-sentencing.

    Hence, there is no inherent unfairness in allowing a defendant to present such claims at sentencing. Post-sentencing rehabilitation is different. By definition, it is not a claim that can be presented at an initial sentencing, and hence is categorically foreclosed for the vast majority of defendants. It can only be raised by defendants who, for one reason or another, obtain re-sentencing. Because post-sentencing rehabilitation essentially constitutes a separate category of claim that is wholly unavailable to certain defendants, consideration of this factor would re-insert unwarranted disparity into the sentencing calculus. That, in turn, would undermine the goal of 18 U.S.S.G. § 3553(a)(6), that "[t]he court . . . shall consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

    In the second sense, if post-sentencing rehabilitation is considered by courts in re-sentencing after *Booker*/*Fanfan*, the Bureau of Prisons' role will be minimized and inappropriate

double-counting may often result, in the case of incarcerated defendants. Following the logic that the Sentencing Commission had endorsed, the Court of Appeals for the Eighth Circuit discussed this issue as follows:

> In the *Sims* decision, we also recognized that Congress has already put into place a procedure to account for a defendant's excellent prison conduct by abolishing the parole system and granting statutory authority to the Bureau of Prisons to award good-time credits pursuant to 18 U.S.C. § 3624, an administrative remedy which may well preclude a court from considering post-sentencing rehabilitation at re-sentencing. *See id.* We stated that "[i]n order to determine whether a defendant is eligible for a downward departure for exemplary conduct in prison, a district court must make the very same determination that Congress chose to place within the authority of the Bureau of Prisons." *Id.* By granting Ms. Hasan's downward departure motion based on her in-prison conduct, she is given the opportunity to be rewarded twice for the same efforts, a sort of reverse "double counting." As we stated in *Sims*, "[p]ermitting a downward departure at a re-sentencing based on post-sentencing rehabilitation thus may interfere with the Bureau of Prison's statutory power to award good-time credits to prisoners." *Id.*

*United States v. Hasan*, 245 F.3d 682, 688 (8th Cir. 2001). The tasks of the Bureau of Prisons counsel strongly against the consideration of a downward departure based on post-sentencing rehabilitation here.

Thus, the Court should not consider the defendant's participation in anger management and substance abuse courses, and claims of rehabilitation, at re-sentencing. Not only would such a basis to lower the defendant's sentence ignore the clear policy statements set forth above, but it is wholly unsupported by the facts in this case. As set forth in greater detail in the Government's October 13, 2005 submission to the Court, in April 2003, the defendant was found to be in possession of heroin, concealment items and packaging materials. Through his conduct he has demonstrated that the risk of recidivism is extraordinarily high and he cannot be said to have rehabilitated himself. Thus, the lifetime term of imprisonment imposed by the Court was

warranted, and, under the circumstances, any sentence short of lifetime imprisonment would be unreasonable.

Moreover, this defendant managed to achieve what few incarcerated defendants manage to accomplish, he now stands convicted of another crime, and his total offense level has increased from a level 45 to a level 47.  See PSR, Third Addendum.  In short, lowering the defendant's sentence would reward him for continued criminal conduct, and would send entirely the wrong message.  This Court recently presided over the trial of Eddie Mercado, a.k.a. "Tan" who convicted of VICAR Murder and the use of a silencer to commit a crime of violence.  He was regularly described as a founding member of the Estrada drug trafficking organization, and his name came up almost everyday of trial as he was linked to shootings and other acts of violence, drug trafficking, and conspiracy to obstruct justice in connection with the murder of Ada Escalera.  His participation in those crimes was only compounded by the fact that he refused to testify about his knowledge of those offenses even after he was given immunity from prosecution.

## CONCLUSION

For the foregoing reasons, this Court should indicate, for the record, that after consideration of the defendant's Guidelines range and all of the factors listed in 18 U.S.C. § 3553(a), it is vacating the defendant's original sentence and reimposing a sentence of a lifetime term of imprisonment.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY


ALINA P. REYNOLDS
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. CT14968
UNITED STATES ATTORNEY'S OFFICE
915 LAFAYETTE BOULEVARD
BRIDGEPORT, CT 06604
(203) 696-3000


ALEX V. HERNANDEZ
SUPERVISORY ASSISTANT U.S. ATTORNEY

## CERTIFICATION

This is to certify that a copy of the above and foregoing was sent on this 21st day of June, 2006, via facsimile and First Class Mail to Margaret Levy, Esq., 21 Oak Street, Hartford, CT 06106-8001.

_____
Alex V. Hernandez